**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA ex rel.** | ) | |
| **MICHAEL THOMAS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **vs.** | ) | **No. 11 C 7743** |
| | ) | |
| **MARC HODGE,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In 1999, an Illinois jury convicted Michael Thomas of first-degree murder in connection with the stabbing death of Keith Stalker on a Chicago street in 1996, and the trial judge imposed a prison sentence of forty years. The Illinois Appellate Court affirmed Thomas's conviction on direct appeal. After Thomas filed an unsuccessful petition for leave to appeal with the Illinois Supreme Court, he filed a petition for post-conviction relief. The Circuit Court of Cook County dismissed the petition, but the Illinois Appellate Court reversed that decision, concluding that Thomas had stated the gist of a constitutional claim. On remand, the circuit court again rejected Thomas's petition, a decision the Illinois Appellate Court affirmed, followed by the Illinois Supreme Court's denial of Thomas's petition for leave to appeal.

Thomas then filed a *pro se* petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 in October 2011, and he also filed a motion for appointment of counsel. Respondent Marc Hodge, the warden of the prison where Thomas is

incarcerated, argued that five of Thomas's seven claims are procedurally defaulted, that six of the claims are otherwise meritless, and that a seventh provides no basis for federal habeas relief. After Thomas replied, the Court dismissed one of Thomas's claims but otherwise declined to dismiss the other claims on procedural and state law grounds. *United States ex rel. Thomas v. Gaetz*, No. 11 C 7743, 2013 WL 53988 (N.D. Ill. Jan. 2, 2013) The Court also appointed counsel to represent Thomas. Thomas then filed, via counsel, a supplemental memorandum of law, to which respondent replied. Thomas filed a motion asking the Court to terminate his appointed attorney. The Court denied that motion in February 2014. Thomas has also filed a *pro se* motion seeking transcripts of certain purported state court proceedings. The Court addresses that motion in this decision, along with the remaining claims in Thomas's habeas corpus petition. For the following reasons, the Court denies Thomas's petition and his motion.

**Background**

The Court incorporates the following background from its prior opinion in this case. *See United States ex rel. Thomas*, 2013 WL 53988, at *1-5.

A.    **State court proceedings**

1.    **The stabbing and Thomas's trial**

Thomas admits that he stabbed Stalker near the corner of Magnolia and Wilson Avenues on November 23, 1996. He contends that he acted in self-defense and in defense of others or, in the alternative, that he should have been convicted of second-degree murder on a theory that he unreasonably believed that he was acting in self-defense and defense of others.

Thomas—then a member of the Black P-Stone Nation street gang—was selling

crack cocaine on the street outside of 4541 North Magnolia Avenue on November 23 with Tory Jackson, Tyrone Curry, and Solomon Monroe, all fellow gang members. Stalker—who belonged to the Gaylord Nation street gang—was also in the neighborhood that day. Stalker frequently bought cocaine from the group, and he would occasionally bring other drug users to buy from them, in exchange for which the sellers would give Stalker free cocaine.

Around 2 a.m. on November 23, two other members of the Gaylord Nation gang drove into the area in a red GMC Blazer. It is undisputed that at some point between 2 a.m. and 4 a.m., the two men stole approximately $150 worth of cocaine from Black P-Stone Nation gang members. Jackson testified at Thomas's trial that he was the one responsible for selling the drugs that day. Jackson stated that sometime before 3 a.m., the two unidentified men pulled up outside of the porch where he was sitting with Stalker. One of the men got out of the car and talked with Stalker about buying an "eight-ball" (1/8 of an ounce) of cocaine, which Jackson agreed to sell for $150. Jackson instructed the men to drive around the block while he prepared the drugs for sale. Jackson testified that Monroe gave him the cocaine as the men drove around the block. The men returned a few minutes later and stopped the Blazer in the middle of the street. As Jackson reached through the passenger window to show them the cocaine, the passenger yelled to the driver to drive away. Jackson stated that he hung onto the car, trying to recover the drugs, until the men ran him into a pole approximately two blocks away. According to Jackson, Stalker was not involved in the theft.

Jackson testified that after he regained consciousness, he walked back to 4541 North Magnolia, where he met up with Thomas. Jackson stated that Thomas punched

him in the eye as punishment for losing the drugs, and was "stabbing the dirt with his knife." Resp.'s Ex. Q at F-40. Thomas and Jackson walked out into the street, where they saw Curry and Monroe with Stalker. Curry and Monroe then began punching Stalker and beating him with a wooden 2x4 they had taken out of a dumpster. According to Jackson, Thomas walked toward the group, took out a knife, and stabbed Stalker. Jackson testified that during the entire incident, Stalker never fought back and never had a weapon in his hands.

At his trial, Thomas testified on his own behalf, recounting a different version of events. Thomas did not dispute that around 2 a.m., the two unknown Gaylord Nation gang members drove up to 4541 North Magnolia. According to Thomas, however, Stalker then got into the car with the two men, and they drove away. They returned about thirty minutes later, got out of the car, and asked Jackson if they could "buy some drugs." Resp.'s Ex. S at F-270. Thomas testified that he and Curry advised Jackson not to sell to the men because they did not know them very well. Thomas contends that when Jackson refused to sell them cocaine, Stalker and the two other men left the area.

According to Thomas, the Blazer returned approximately fifteen minutes later. The three men again got out of the Blazer and asked if they could purchase an eight-ball of cocaine. Thomas and Curry again advised Jackson not to sell to them, but Jackson disagreed, packaged the cocaine, and gave it to one of the men for inspection. Instead of paying, the man with the cocaine "swung on" Jackson, and the three men ran for the car. *Id.* at F-273. Jackson ran after the man with the drugs and tackled him to the ground. According to Thomas, Stalker joined the fight against Jackson, and Monroe jumped in to help defend his fellow gang member. Thomas contends that it was Stalker

who grabbed the wooden 2x4 from the dumpster and hit Monroe with it several times. Thomas then joined the fight, running toward Stalker and punching him in the stomach. Stalker turned and swung the board at Thomas's head but missed. Thomas grabbed Stalker by the waist, and Stalker began choking him. In response, Thomas grabbed the knife he had stored in the front pocket of his sweatshirt and stabbed Stalker in the stomach.

Thomas testified that while he and Monroe were fighting with Stalker, the man with the cocaine freed himself from Jackson and ran toward the Blazer. Jackson gave chase, but the man successfully reached the car (the driver was already inside), and the two sped away in the Blazer, with Jackson hanging onto the passenger side door. After the stabbing, Thomas and Monroe jumped into Monroe's car, drove to the alley to pick up Jackson and Curry, and drove south to the house of Thomas's girlfriend, Sonia McKinstry, on Aberdeen Street between 52nd and 53rd Streets. Jackson and Monroe left the area soon afterward, but Thomas and Curry stayed at McKinstry's apartment until they were arrested three days later.

On November 26, 1996, Jackson returned to the corner of Wilson and Magnolia, where police arrested him in connection with Stalker's death. After questioning him about his participation in the incident, Jackson led police to McKinstry's house, where they arrested both Thomas and Curry. After his arrest, Thomas was interviewed multiple times by the police and an assistant state's attorney. At 2 a.m. the next day, Thomas signed a statement admitting that he stabbed Stalker after seeing Curry and Monroe beating Stalker up because he was getting "angrier about what the guys in the Blazer had done and thought Keith [Stalker] shared the blame for it." Resp.'s Ex. R at

F-237.  Thomas also stated that Stalker did not have anything in his hands when Thomas stabbed him.  Thomas was charged with first-degree murder.  Curry, Monroe, and Jackson were also charged in connection with Stalker's death.

The trial judge appointed a public defender to represent Thomas.  Thomas moved to quash his arrest and suppress his statement to the authorities.  On January 8, 1998, the trial judge held a pretrial hearing on the motions.  Resp.'s Ex. P at A-1–93.  Thomas and Curry both testified, as did two of the officers involved in Thomas's arrest— Detectives Philip Mannion and Dennis Gray.  Because McKinstry, who had been subpoenaed to testify, was not available that day, the court continued the matter.  McKinstry testified on May 12, 1998, and the court denied Thomas's motions on July 15, 1998.

Thomas's jury trial began on January 20, 1999.  In its case-in-chief, the prosecution called Jackson to testify.  Jackson had recently been acquitted of the murder in a separate trial.  Detective Mannion and Assistant States' Attorney Karen O'Malley also testified, recounting the circumstances surrounding Thomas's signed statement.  The parties stipulated to the autopsy report, which the prosecution read into evidence.  In it, Dr. Aldon Fusaro, a deputy medical examiner at the Cook County Medical Examiner's Office, concluded that Stalker died of a stab wound to the abdomen and that blunt force to his head was a contributing factor.  Dr. Fusaro also noted in the report that Stalker had "[c]ontusions over the knuckles of the right thumb and index finger."  Resp.'s Ex. R at F-203.

After the prosecution rested, Thomas took the stand in his own defense, giving his account of the circumstances that led him to stab Stalker.  Thomas denied ever

reading the statement that O'Malley wrote for him to sign, and he contended that the written statement inaccurately reflected what he told Mannion and O'Malley in his post-arrest interviews. In rebuttal, O'Malley challenged Thomas's testimony that the statement was inaccurate, and she testified that Thomas never told her that Stalker attacked him that evening. Thomas's attorney conceded in closing argument that Thomas stabbed Stalker but argued that he did so only in defense of himself and Monroe, or alternatively, that Thomas unreasonably believed he was doing so in defense of himself and Monroe and was therefore guilty of second-degree murder rather than first-degree murder. On January 21, the jury found Thomas guilty of first-degree murder.

Thomas appealed his conviction to the Illinois Appellate Court on four grounds, none of which he has included in his habeas corpus petition before this Court. The court affirmed his conviction on November 15, 2000, and the Illinois Supreme Court later denied Thomas's *pro se* petition for leave to appeal (PLA).

### 2. State post-conviction proceedings

Thomas filed a *pro se* petition for post-conviction relief in the Circuit Court of Cook County on September 25, 2001. In the petition, Thomas raised the following claims:

- The prosecutor violated his right to due process by knowingly eliciting false testimony from Jackson.

- He was denied due process when the prosecutor failed to disclose an interview with Steven Myvett—a cocaine user who had been in the area on the night of Stalker's death—in which Myvett told prosecutors about material facts that corroborated Thomas's defense and impeached Jackson's testimony.

- His trial counsel rendered ineffective assistance by failing to

investigate or call witnesses on his behalf.

- His appellate counsel was unconstitutionally ineffective for failing to argue trial counsel's ineffectiveness and the prosecutor's knowing use of false testimony on direct appeal.

In December 2001, the state trial court dismissed Thomas's petition upon initial review as "patently without merit." Resp.'s Ex. F at C-35.

The Illinois Appellate Court reversed and remanded. The court found that Thomas's petition "state[d] the gist of claims of constitutional deprivations in its allegations that the prosecution withheld favorable evidence and that Thomas received ineffective assistance from his trial counsel." Resp.'s Ex. E at 1. The court explained that these claims adequately alleged constitutional deficiencies and that summary dismissal was therefore improper. *Id.* at 5. The Illinois Supreme Court later denied the state's PLA.

On remand, Thomas timely filed, *pro se*, an amended post-conviction petition. Thomas repeated the claims from his first petition and added five new claims. Among them was a claim that the prosecutor and the trial court had destroyed certain transcripts from Thomas's pre-trial hearing that he alleged contained favorable testimony by the arresting officers and replaced them with new contradictory testimony. Specifically, Thomas contended that each officer's original testimony conflicted with the other officers' versions of events and conceded several errors in arresting Thomas. After hearing this testimony, Thomas contended, the court "ordered the transcription to be taken 'off the record' or destroyed," and allowed the officers to re-testify about the circumstances surrounding Thomas's arrest. Resp.'s Ex. U at C-162. Thomas also included a new claim that trial counsel was constitutionally ineffective for failing to

challenge the court's purported action or preserve the matter for appellate review.

On May 27, 2008, the trial court granted the state's motion to dismiss the amended petition. The court addressed only two of the grounds that Thomas raised in his petition: Thomas's claim that the trial court erased testimony from his pre-trial hearing and ordered the officers to re-testify, and his claim that trial counsel was constitutionally ineffective when she failed to investigate and call Myvett and Dr. Fusaro as witnesses at trial. The court did not acknowledge or address any of Thomas's other claims. The court found that Thomas had waived both of these claims by failing to raise them at trial or on direct appeal and that even if the claims were not procedurally barred, they lacked merit.

Thomas timely appealed to the Illinois Appellate Court. The Office of the State Appellate Defender was appointed to represent him. Appointed counsel asserted only one argument in her brief. Specifically, she argued that Thomas had made a showing that trial counsel was ineffective for failing to investigate Myvett and Dr. Fusaro that was sufficient to warrant an evidentiary hearing on that claim.

Even before Thomas's appointed counsel filed a brief on his behalf, Thomas began filing motions with the appellate court, complaining that his attorney was planning waive some of his claims and asking leave to file a supplemental *pro se* brief. See Pet.'s Ex. 25 at 7. The court denied his request. After appointed counsel filed the one-issue brief on Thomas's behalf, Thomas filed a motion asking to proceed *pro se* and asking the court to strike the appellate defender's brief and set a new briefing schedule or to allow Thomas to file a supplemental brief on his own behalf. Thomas contended that he was "being forced to waive meritorious claims of which the law would require

relief," including his claim that the prosecutor withheld favorable evidence and his claim that the trial court destroyed testimony given at his pretrial hearing. Pet.'s Ex. 28 at 3. The court also denied this request.

On September 20, 2010, the Illinois Appellate Court affirmed the lower court's dismissal of Thomas's claim of ineffective assistance of trial counsel, finding that "defense counsel clearly made a strategic decision not to call Myvette [sic] and Dr. Fusaro as witnesses because their testimony would have harmed more than helped defendant's case. Moreover, defendant was not prejudiced by their absence at trial." Resp.'s Ex. J at 10. Thomas timely filed a pro se PLA, including the additional claims he had sought leave to file at the appellate level. The Illinois Supreme Court denied the PLA.

**B.    Thomas's habeas corpus petition**

On October 31, 2011, Thomas filed a *pro se* habeas corpus petition in this Court. In his petition, Thomas asserts seven claims. First, Thomas claims that his trial counsel rendered ineffective assistance when she failed to investigate or call witnesses that would have corroborated his claim of self-defense. Second, Thomas contends that his due process rights were violated because the state trial court doctored the transcript of the proceedings, removing police officers' purported favorable testimony from the record of a pretrial hearing, and that he was further denied due process because various state courts refused to provide him transcripts of what he says was the original testimony. Third, Thomas claims that his due process rights were violated because the prosecutor knowingly presented the officers' false testimony at the alleged do-over of the pretrial hearing. Fourth, Thomas argues that the prosecutor procured testimony from Jackson

that she knew was false, in violation of *Napue v. Illinois*, 360 U.S. 264 (1959)—namely, Jackson's claim that he received no leniency in exchange for his testimony at Thomas's trial. Fifth,[1] Thomas alleges that the prosecutor wrongfully withheld her pretrial interview with Myvett, who told her facts that Thomas contends were materially helpful to his defense, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Sixth, Thomas contends that his trial counsel was unconstitutionally ineffective for failing to preserve his missing transcript/changed testimony claim because she did not challenge the trial court's striking of the purported favorable testimony at the pretrial hearing and did not object to the subsequent conflicting testimony. Seventh, Thomas argues that the Illinois Appellate Court violated his due process rights when it failed to allow him to proceed *pro se* in his appeal from the second denial of his post-conviction petition.

After respondent filed a response to Thomas's petition, Thomas filed a motion asking the Court to order respondent to produce transcripts from February 18, 1998, March 3, 1998, April 9, 1998, and April 20, 1998. Thomas argues that the transcripts from these dates support his claims regarding the "doctored" testimony and transcripts. The Court issued an opinion and order in the case after Thomas filed his reply, in which it addressed most of respondent's procedural arguments against Thomas's claims and also appointed counsel for Thomas. In the opinion, the Court first addressed Thomas's claims related to the transcripts from his trial, reserving judgment on the claims and leaving it for appointed counsel to assess whether to pursue them. The Court next concluded that Thomas's *Brady* claim was not procedurally defaulted. Although

---

[1] Thomas lumps together in a single claim the claims that the Court has referred to as his fourth and fifth claims, but the two claims are logically distinct, so the Court lists them separately here.

11

Thomas's appellate counsel on post-conviction did not assert the claim on appeal, Thomas adequately presented the claim to the state court in asking it to strike his appellate counsel's brief and allow him to submit a supplemental brief. The Court did, however, conclude that Thomas's *Napue* claim was defaulted and that Thomas did not offer cause sufficient to excuse the default. Finally, the Court concluded that Thomas's seventh claim, dealing with the denial of his right to proceed *pro se* on post-conviction appeal, was not presented as a separate basis for granting habeas relief, but rather as support for Thomas's other claims. The Court noted that respondent had not argued that Thomas's first claim (a claim of ineffective assistance of counsel for failing to investigate or call witnesses), was defaulted, and the Court reserved judgment on this and the other remaining claims.

## Discussion

A petitioner is entitled to a writ of habeas corpus "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). A federal court may issue a writ of habeas corpus on a claim that was adjudicated on the merits in state court proceedings only if the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Id.* § 2254(d); *see also Burt v. Titlow*, 134 S. Ct. 10, 15 (2013). This is a "highly deferential standard for reviewing claims of legal error by the state courts." *Id.*

## A.    Ineffective assistance of counsel

In Thomas's first claim, he contends that his trial counsel was ineffective for failing to investigate and call two witnesses:  Steven Myvett and Dr. Aldon Fusaro, the medical examiner.  These witnesses, he says, "were necessary to corroborate not only various claims, but pivotal disputes between the defense and prosecution."  Pet.'s Pro Se Mem. at 4.  Thomas argues that Myvett was present before the murder of Stalker but gave conflicting statements to police about the matter and was beaten and coerced into providing "bogus/false statements to imprison petitioner."  *Id.* at 5.  Had trial counsel investigated Myvett, Thomas argues, she would have learned that Myvett had evidence favorable to the defense, such as the fact that he witnessed a fight between the robbers and Thomas's group of colleagues before the murder.  Thomas also says Dr. Fusaro could have corroborated this version of events, because he "believed that the decedent might have been fighting prior to his death," given the "abrasions and lacerations" to his knuckles and fingers.  *Id.*

Respondent, on the other hand, contends that the state appellate court's rejection of these arguments was reasonable.  Myvett's testimony would not have assisted Thomas's defense, respondent argues, because Myvett did not witness the stabbing and had provided differing stories to police, "some of which implicated petitioner in the stabbing."  Resp.'s Mem. at 21.  Further, respondent contends that it was clear Thomas's trial counsel knew of Myvett's discussions with police, because the record from Thomas's pretrial hearing demonstrates the attorney's knowledge of Myvett's statements.  Thus, respondent argues, it was not deficient performance for the trial counsel to decline to call Myvett as a witness.  As for Dr. Fusaro, respondent

argues that trial counsel reasonably stipulated to Dr. Fusaro's autopsy report on Stalker rather than calling Dr. Fusaro to testify. "[T]o call Fusaro to testify about the scrapes [on Stalker's hand] would open Fusaro to damaging cross-examination that would highlight the evidence of the beating Stalker sustained at the hands of petitioner and his accomplices." *Id.* at 22.

To establish a claim of ineffective assistance of counsel, a petitioner must show both deficient performance and prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To qualify as deficient, the performance must "f[a]ll below an objective standard of reasonableness," considered "under prevailing professional norms." *Id.* at 688. Courts must be "highly deferential" when scrutinizing counsel's performance, which is subject to a "strong presumption" that it "falls within the wide range of reasonable professional assistance." *Id.* at 689. As for prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

The Illinois Appellate Court rejected Thomas's ineffective assistance of counsel claim on its merits. Thus this Court's review is "doubly deferential," owing to the application of both *Strickland* and 28 U.S.C. § 2254(d), which requires deference to state court decisions. *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013). In other words, "[w]e take a 'highly deferential' look at counsel's performance, through the 'deferential lens of § 2254(d).'" *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011) (citations omitted) (quoting *Strickland*, 466 U.S. at 689; *Knowles v. Mirzayance*, 556 U.S. 111, 121 n.2 (2009)).

Thomas disputes the appellate court's conclusion that his trial counsel's failure to call these witnesses was reasonable trial strategy. He first argues that his trial counsel never argued herself in any hearing or affidavit that it was her strategy not to call these witnesses. He contends essentially that the appellate court's determination that trial counsel's strategy was reasonable was a *sua sponte* conclusion and thus inappropriate—"clearly a violation of federal law," because "a state court may not make a claim that counsel has not made for itself." Pet.'s Pro Se Mem. at 7. He therefore argues that the court's decision was contrary to clearly established law, though he does not cite any particular clearly established law the appellate court supposedly violated by deciding upon this rationale. He goes on to contend that if trial counsel had called Myvett and Dr. Fusaro, "the outcome of the case would have been different" because their testimony would have helped the jury understand that the prosecutor's version of events was not "completely trustworthy." *Id.* (citing *Moffett v. Kolb*, 930 F.2d 1156, 1161 (7th Cir. 1991).

Thomas has failed to show that the state appellate court's rejection of this claim was unreasonable on either part of the *Strickland* analysis. With regard to Myvett, the court pointed to Myvett's varying statements to police about the events preceding the stabbing, as revealed at Thomas's pretrial proceedings. The court concluded that "[g]iven the varying statements, any favorable testimony would have been subject to severe impeachment, and calling Myvette [sic] as a witness probably would have been harmful to defendant." Resp.'s Ex. J at 11–12. Thomas's trial counsel participated in the pretrial hearing, asking specific questions about Myvett's changing story, indicating her knowledge of his differing accounts. Based on this record, the appellate court

reasonably concluded that, given this knowledge, a decision not to call Myvett during trial did not amount to deficient performance. Thomas's argument that Myvett's account was obtained through police violence and coercion does not change things. The appellate court had that argument before it as well; though the court did not specifically address the point, it nonetheless concluded that a reasonable judgment could be made that Myvett would be shown to lack credibility and would not have helped Thomas's defense.

The court's decision on the prejudice aspect of *Strickland* with regard to Myvett was also reasonable. Myvett's 2001 declaration, which Thomas has cited throughout the state post-conviction proceedings and in this case, and the affidavit that Thomas's appointed counsel obtained from Myvett in connection with the present case, both show that Myvett did not witness the stabbing of Stalker. Rather, both statements indicate that Myvett left the scene before Stalker was killed. Even were one to accept Thomas's contention that Myvett saw a fight between Thomas's group and the rival gang group outside their vehicle—a contention that is not entirely clear from Myvett's two affidavits—Myvett does not explicitly link that fight to Stalker's murder in a way that would tend to support a claim of actual or unreasonable self-defense or defense of others. The appellate court was thus reasonable in its conclusion: "While the above-stated evidence may have bolstered defendant's rendition of the facts, the value was not enough to demonstrate prejudice, i.e. create a reasonable probability that the outcome of the proceeding would have been different." Resp.'s Ex. J at 13.

The Court similarly concludes that the appellate court's decision on this claim with regard to Dr. Fusaro was not unreasonable. With regard to the prejudice

requirement of *Strickland*, Dr. Fusaro's findings were read into evidence to the jury at Thomas's trial. They included his finding that Stalker had "[c]ontusions over the knuckles of the right thumb and index finger." Resp.'s Ex. R at F203. The jury was thus made aware of the injury Thomas points to here. Thomas contends that Dr. Fusaro later told a state investigator that he had a "belief that decedent was fighting prior to his death." Pet's Pro Se. Mem. at 6. But when one of Thomas's attorneys interviewed Dr. Fusaro in 2004, Dr. Fusaro told the attorney that the wounds "could be an indication of a struggle or could be considered defensive wounds," but he "was not able to say with certainty that the wounds indicate the deceased was fighting or struggling before being killed." Resp.'s Ex. U at C87–88. Regardless, as the state appellate court noted, "there was far more evidence indicating that Stalker was beaten." Resp.'s Ex. J at 12. This evidence was plain in Dr. Fusaro's stipulated report, which was read to the jury and spoke to a host of injuries, including "multiple blunt trauma of the head," as well as "hemorrhage in the kidneys and adrenal gland and incised wounds with surrounding hemorrhage in the area of the right abdominal wall musculature and diagram." Resp.'s Ex. R at F203–04.

The appellate court did not act unreasonably in concluding that even if Dr. Fusaro had testified in person at the trial and had told the jury that Stalker might have been fighting before his death, the number and nature of Stalker's other injuries demonstrated that Thomas "was not acting in self-defense when he stabbed Stalker." Resp.'s Ex. J at 12. Further, as the appellate court noted, the knuckle contusion evidence "is equally consistent with the other medical evidence showing that Stalker was beaten, and does not necessarily support defendant's self-defense claim." *Id.* at

13. This conclusion aligned with the available evidence.

Considering the evidence outlined above, the Court concludes that the state appellate court's decision to reject Thomas's ineffective assistance claim was reasonable on both Myvett and Dr. Fusaro. The Court therefore declines to grant Thomas habeas relief on his first claim.[2]

## B.    Failure to disclose evidence

Thomas contends in his fifth claim that the prosecutor in his case was aware of Myvett's true account of events—including the fact that his earlier contrary accounts were the product of police beating him and coercing him—but did not turn this information over to Thomas during his trial. As noted above, the Court concluded in its prior decision that this claim was not procedurally defaulted, because the state courts did not address it despite Thomas's presentment of the claim on a *pro se* basis. The Court now turns to the merits of this claim and reviews it *de novo*. *See Cone v. Bell*, 556 U.S. 449, 472 (2009).

Thomas contends that the prosecutor learned from Myvett on the first day of trial that police had coerced him with violence and threats to make statements implicating Thomas in Stalker's murder. Thomas further contends that the prosecutor also learned that Myvett saw a fight between Thomas's group of men and the rival gang group prior to Stalker's murder. Thomas contends that the prosecutor then decided not to call Myvett as a witness and did not inform Thomas of Myvett's exculpatory account. "There

---

[2] In his *pro se* reply, Thomas also alleges that his trial counsel told the court that she was "not prepared for trial," citing a page of the trial transcript that is not in the record that respondent provided. Pet.'s Pro Se Repl. at 2. However, Thomas made this particular argument for the first time in his reply, and he did not make it in any prior proceeding. The Court therefore declines to consider it.

was one problem with all of this," Thomas argues; "the prosecutor was in violation of the Brady rule when [she] did not turn over exculpatory exonerating evidence to the defense from Myvett." Pet.'s Pro Se Mem. at 16. Thomas argues this failure was prejudicial, because he could have used the evidence from Myvett "to impeach state witnesses, or their credibility." *Id.* at 17. Specifically, he contends, as on his ineffective assistance claim, that Myvett could have told the jury about a fight occurring between the men on the street prior to Stalker's murder, along with the fact of the police beating and threatening him into making a false statement. "Myvett's testimony would have definitely put the case in a 'different light' where [the] jury, reasonably, may have reached a different verdict, had this information been disclosed." *Id.* (citing *Kyles v. Whitley*, 514 U.S. 419, 435 (1995)).

"[S]uppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. In the *Brady* context, evidence is considered material "when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Cone*, 556 U.S. at 469–70. The petitioner can demonstrate such a reasonable probability if "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Smith v. Cain*, 132 S. Ct. 627, 630 (2012) (internal quotation marks and alterations omitted). Summing up these requirements, the Supreme Court has laid out a test for showing *Brady* violations: "a convicted defendant must make each of three showings: (1) the evidence at issue is favorable to the accused, either because it is exculpatory, or because it is impeaching;

(2) the State suppressed the evidence, either willfully or inadvertently; and (3) prejudice ensued." *Skinner v. Switzer*, 131 S. Ct. 1289, 1300 (2011) (internal quotation marks and alterations omitted).

As with Thomas's ineffective assistance of counsel claim, the Court concludes that his *Brady* claim is without merit. There is not a reasonable probability that the result of his trial would have been different had the prosecution informed Thomas about Myvett's recounting of his communications with police. As noted above, Myvett did not witness the murder of Stalker, and the extent to which his account of events prior to the murder matches that of Thomas is unclear from the record. Furthermore, as the state court discussed, the varying nature of Myvett's accounts likely would have detracted from his credibility—which encompasses Myvett's contention that his statements to police were originally coerced. The other evidence in the trial against Thomas—his confession, and an eyewitness account—was quite strong. As a result, the benefit of Myvett's account would not have been of sufficient import to overcome the inculpatory evidence and produce a different result. The Court therefore concludes that Thomas's *Brady* claim lacks merit.

## C. Destruction and alteration of transcripts

Thomas's second, third, and sixth claims from his petition concern his contention that "he was denied relevant pre-trial motions transcripts from hearing dates that proved the government was involved in massive corruption." Pet.'s Pro Se Mem. at 8. Specifically, he contends that at an initial pretrial hearing, police detectives involved in his case admitted that they violated his constitutional rights along with other facts that bolstered his defense. Then, Thomas argues, "the judge <u>ordered</u> that the detectives '<u>re-</u>

<u>do</u>' their testimonies on subsequent dates." *Id.* On those subsequent dates, Thomas

says, the detectives gave other testimony contradicting their prior statements, and the

judge "instructed the court reporter to take the original testimonies out of the record and

only to allow the second/subsequent testimonies to be part of the current official

transcript." *Id.* Citing these events, Thomas asserts three claims in his petition: first, a

due process and equal protection violation owing to state officials' refusal to produce the

transcripts Thomas says are missing; second, a violation of due process and his right to

a fair trial flowing from the destruction and alteration of the transcripts; and third, a claim

that his trial counsel was ineffective for failing to preserve his claims relating to the

transcripts. Respondent argues that these claims are procedurally defaulted and that

they are without basis in fact.

In January 2013, the Court concluded that Thomas's *Brady* claim, discussed

above, was not procedurally defaulted because he had adequately presented it to the

state courts. Although Thomas's appellate attorney did not include the claim in

Thomas's post-conviction appellate briefs, the Court determined that Thomas

nonetheless adequately presented the claim in *pro se* pleadings to the appellate court.

*See United States ex rel. Thomas*, 2013 WL 53988, at *7–8. Through counsel, Thomas

now argues the same result should apply to his transcript claims. Thomas "expressly

sought review of the appellate court's order denying his request to present" these

claims, which are thus "no different from his *Brady* claim." Pet.'s Supp. Mem. by Cnsl.

at 4. Respondent argues that the state post-conviction trial court decided that Thomas's

transcript claims were waived because they were not raised on direct appeal and also

found the claims meritless. The court's finding of waiver, respondent argues, was "an

independent and adequate state law ground of decision barring federal review."  Resp.'s Repl. to Pet.'s Supp. Mem. at 3.

Unlike Thomas's *Brady* claim, which the state courts never addressed, the state trial court did, as respondent points out, examine Thomas's transcript claims.  The post-conviction trial court first found that Thomas's failure to raise the claims on direct appeal constituted waiver; the court then rejected the claims on the merits, finding that "the trial court did not erase the testimony from petitioner's motion to suppress."  Resp.'s Ex. V at C440.  Following this decision, Thomas's appointed counsel did not raise the claim on appeal.  Similar to Thomas's *Brady* claim, however, he attempted to raise them *pro se* during his appeal on his post-conviction proceeding, but the appellate court declined to consider his arguments.  Thus, for the reasons described in the Court's earlier ruling with regard to the *Brady* claim, the Court concludes that Thomas did not commit a procedural default and will consider the transcript-related claims on their merits.

Thomas alleges, lacking support other than his own assertions, a conspiracy to destroy the transcripts from a pretrial hearing in his case and replace them with fabricated or false transcripts.  This conspiracy, as Thomas tells it, involved the trial judge, the judge's court reporter, and three detectives who later reversed the content of their testimony after initially testifying in his favor.  In his *pro se* petition, Thomas argues that "the trial court then ordered the original testimonies to be taken 'out of the record,'" Pet. at 7, as though he is quoting a transcript—but the quotations he provides do not appear in any transcript on record.  Rather, Thomas points to the judge's handwritten notes on various court dates on the "half sheet" (the rough equivalent of a docket sheet), as well as the certified statement of conviction/disposition from his case, which

includes a list of "disposition(s)" that "was/were rendered before the honorable judge." Resp.'s Ex. O at C2. Both documents contain notations as to dates on which Thomas claims hearings were held where the detectives "'<u>COMPLETELY</u>' changed their previous / original testimonies." Pet. at 7. This, he says, was because "the judge instructed the detectives to commit perjury so the bogus statement[s] would be admissible at trial." *Id.* at 9. Subsequently, Thomas argues, the trial judge "instructed the court reporter to take the original testimonies out of the record and only to allow the second / subsequent testimonies to be part of the current official transcript." Pet.'s Pro Se Mem. at 8.

The four dates Thomas points to—February 18, March 3, April 9 and April 20, all in 1998—do appear within the certified statement of his case, although not all of them appear on the half sheet. Nonetheless, neither document suggests anything untoward. The handwritten notes on the half sheet say "HEARING HELD" on January 8, 1998, which Thomas concedes was the date of his pretrial motion hearing. *See* Resp.'s Ex. U at C3. But none of the entries for the other dates suggests hearings were held on those dates. This undercuts Thomas's claim that the trial court held hearings on those days during which the detectives provided updated, false testimony.[3] Further, the certified statement of disposition does not indicate much of anything, save for various court dates in Thomas's case along with the fact that each date included a "continuance by agreement." *See* Resp.'s Ex. O at C4–C5. Thomas cites no further evidence of any kind referring to the court dates in question, let alone their purported illegitimate

---

[3] Of course, by the logic of Thomas's allegation that his judge was in on the conspiracy, the judge's own handwritten notes might not reflect the illegal activity taking place. However, the Court is not willing to infer the truth of Thomas's allegations from the mere absence of evidence.

purpose—and nothing at all to suggest that the transcript on record from January 8, 1998 is a fabrication. Thomas's appointed counsel and a colleague conducted several interviews in a thorough effort to investigate Thomas's transcripts claim. The interviewees included Thomas's trial counsel, the court reporter from his pretrial hearing, the prosecutor from the pretrial hearing, Thomas's father, and two attorneys who assisted Thomas in attempting to locate the alleged missing transcripts. According to counsel, "[n]one provided information that, in the undersigned's view, should be brought to the Court's attention." Sealed Resp. of Cnsl. To Pet.'s Mot. To Have Cnsl. Withdrawn at 4.

In short, there is no factual foundation for Thomas's second, third, and sixth claims. On the second claim, there is no evidence that there were transcripts available for the state to deliver him on the dates in question. On the third claim, there is no evidence that the trial judge and prosecutor in his case destroyed transcripts containing testimony favorable to Thomas and then substituted unfavorable testimony. Finally, on the sixth claim, there is no evidence that there was a claim for Thomas's trial counsel to preserve regarding the alleged destruction of the transcripts. In light of the evidence discussed above, Thomas's unsupported contentions about these events are insufficient to warrant a hearing or further development of the record. The Court concludes these claims lack merit. For these same reasons, the Court also denies Thomas's second motion for production of transcripts [docket no. 47], because there is no evidence the requested transcripts exist.

**D.** **Certificate of appealability**

When a district court enters a final judgment that dismisses a prisoner's habeas

corpus petition, it must issue or deny a certificate of appealability (COA). "[F]ederal courts of appeals lack jurisdiction to rule on the merits of appeals from habeas petitioners" in the absence of a COA. *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003). To obtain a COA, the petitioner must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court should issue a COA if it determines that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (internal quotation marks omitted). When a district court denies a claim on procedural grounds, the petitioner must show both that "jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Id.*

The Court's determinations that the state courts reasonably adjudicated some of Thomas's claims, that his *Napue* claim is procedurally defaulted, and that other claims are without merit are not fairly debatable. The Court therefore declines to issue a certificate of appealability.

### Conclusion

For the foregoing reasons, the Court denies Thomas's habeas corpus petition [docket no. 1], his motion for transcripts [docket no. 47], and also denies a certificate of appealability.

_____
MATTHEW F. KENNELLY
United States District Judge

Date: March 31, 2014